**Raymond LEE, Plaintiff,**

v.

**Thomas A. COUGHLIN, III, Commissioner, James Mahoney, Hearing Officer, Defendants.**

**No. 93 Civ. 8417 (SS).**

United States District Court, S.D. New York.

Sept. 28, 1995.

Raymond Lee, Coxsackie, New York, pro se.

Dennis C. Vacco, Attorney General of State of New York, New York City (June Duffy, of counsel), for defendants.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

Plaintiff Raymond Lee, currently incarcerated in Coxsackie Correctional Facility, brings this action *pro se* under 42 U.S.C. § 1983. Plaintiff alleges that defendant, James Mahoney, as the hearing officer who presided at plaintiff's administrative prison hearing on assault charges, deprived him of due process by denying him as employee assistant to aid him during the hearing and that defendant Thomas A. Coughlin violated his rights by affirming Mahoney's constitutionally infirm decision on appeal. Plaintiff was found guilty of the assault charges and served 376 days in segregation from which he was released after the determination of guilty was annulled as a result of an Article 78 proceeding.

Defendants move for summary judgment[1] under Rule 56 of the Federal Rules of Civil Procedure. Plaintiff cross-moves for summary judgment. For the reasons discussed below, I deny defendant Mahoney's motion for summary judgment on the ground of qualified immunity and grant plaintiff's motion for summary judgment against him. I grant defendant Coughlin's motion for summary judgment on the ground that plaintiff has failed to state or prove a claim against him.

## BACKGROUND

While at Sing Sing Correctional Facility, plaintiff Lee was issued an Inmate Misbehavior Report (hereinafter "IMR") dated June 9, 1992, signed by A. Millen[2] charging him with assault, a violation of institutional Rule 100.10. According to Millen

[o]n 6/9/92 while returning from HBA yard (Tappan) at approximately 9:30 p.m., inmate Pinkney, Terrence 91A4141, P–663, was stabbed on the face, and neck (right

side) by an object which he believed to be a makeshift blade. Upon investigation inmate Lee, R. 80B0756 was identified as the person who inflicted the wound.

Plaintiff's Exhibit A; Defendants' Exhibit D.

On June 10, 1992, in an Unusual Incident Report signed by Superintendent John Keane, the assault on inmate Pinkney was described as follows:

[w]hile returning from HBA inmate Pinkney was attacked by 3 unknown inmates. A struggle incurred [sic] and inmate Pinkney received a 5″ inch laceration on the right side of his face. Area search conducted, no contraband found.

Plaintiff's Exhibit E; Defendants' Exhibit E.

On June 11, 1992, plaintiff was given a form entitled "Sing Sing Correctional Facility Assistance Sheet" (hereinafter "assistance sheet") by Officer C. Hill which informed him of his right to select an employee assistant from a list established by the facility pursuant to N.Y. Comp.Codes R. & Regs. tit. 7, § 251–4.1, 4.2 (1989) (hereinafter "7 NYCRR"). Plaintiff's Exhibit B, Defendants' 3(g) Statement, ¶ 9. As directed by the assistance sheet, plaintiff selected three people in the following order of preference: 1) G. Davis 2) R. Sweeney 3) S. Goldberg.

On June 13, 1992, Sergeant Kelly, who was not designated by plaintiff on the assistance sheet, was assigned to aid inmate Lee. On that date, Sergeant Kelly visited plaintiff who was confined to his cell. She wrote on the assistance sheet "Inmate Lee would prefer to see one of the assistants he chose" and on the line where the inmate would ordinarily sign she wrote "refused to sign". Plaintiff's Exhibit B; Defendants' Exhibit F. There is no indication in the record that Sergeant Kelly did anything more to assist plaintiff to

---

1. Defendants' notice of motion also requested dismissal of plaintiff's complaint under 4(j) (now 4(m) of the Federal Rules of Civil Procedure) based on plaintiff's alleged failure to effect service on defendant Mahoney within 120 days of the issuance of the Summons in the action. That portion of the motion was withdrawn by counsel's letter dated March 24, 1995, and thus will not be addressed.

2. Defendants' Statement Pursuant to Local Rule 3(g) states in ¶ 4 that "[o]n June 6, 1992 in a misbehavior report plaintiff was charged with violating Rule 100.10 assault and accused of stabbing a fellow inmate, Terrence Pinkney in the face and neck with a make shift blade". (Emphasis Added). This is clearly a date error in that the IMR and all other documents refer to the incident as occurring on June 9, 1992.

prepare his defense to the charges against him.

A Tier III disciplinary hearing was convened by Hearing Officer Mahoney to consider the violations alleged in the Misbehavior Report. In the New York Prison System, Tier III disciplinary hearings, also known as Superintendent's hearings, are used for the review of the most serious violations of institutional rules. 7 NYCRR § 270.3 (1989). Plaintiff's disciplinary hearing commenced June 15, 1992 and concluded on July 9, 1992. Six (6) hearing days were held in this time period. *See* footnote 10 *infra.*

After the conclusion of the hearing, Mahoney found the plaintiff guilty and sentenced him to two years in a Special Housing Unit (hereinafter SHU),[3] as well as two years loss of packages, commissary and phone privileges. "Confinement in the SHU is a form of solitary imprisonment. In addition to being separated from the general prison population, SHU inmates are limited in the prison issue items and personal belongings they may possess.... Also limited are shower and exercise privileges." *Walker v. Bates*, 23 F.3d 652, 655 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995) (citations omitted).

Plaintiff alleges that Mahoney violated his constitutional rights under the Due Process Clauses of the Fifth and Fourteenth Amendments by denying him his right to an assistant to aid him in preparing for his hearing. Furthermore, plaintiff alleges that defendant Mahoney was not an impartial hearing officer and that there was insufficient evidence to support Mahoney's determination of plaintiff's guilt. On July 10, 1992, plaintiff filed an administrative appeal of defendant Mahoney's determination. On September 3, 1992,

defendant Coughlin affirmed the disposition of plaintiff's disciplinary hearing.[4] Plaintiff claims that Coughlin improperly affirmed the constitutionally infirm determination against him.

On December 22, 1992, plaintiff filed an Article 78 action[5] in New York State Supreme Court, Westchester County. By Order dated May 21, 1993, Justice James R. Cowhey found that:

the conflicting evidence coupled with denial of petitioner's right to meaningful assistance, both prior to and throughout the hearing, requires a reversal of the finding of guilt to the assault charge. The Hearing Officer's disposition, as affirmed by respondent, was two years' confinement in a Special Housing Unit (SHU); two years loss of packages, commissary and phones (the period to run from June 9, 1992 through June 9, 1994). Under all these circumstances the determination of guilt and imposition of penalty thereon is annulled in all respects and respondent is directed to expunge all reference to this matter from the records. The Court determines that a new hearing would not be appropriate under all the facts herein.

Plaintiff's Exhibit H, p. 6.

Plaintiff was released from SHU in Southport Correctional Facility on June 21, 1993, after having served 376 days in segregation. Plaintiff's Affidavit in Support of Motion for Summary Judgment, p. 3, ¶ 23. As a result of the state court's decision on plaintiff's Article 78 proceeding, all of plaintiff's records containing references to the disciplinary charges were expunged. Defendant's Exhibit P. Plaintiff's instant action seeks monetary damages for defendants' alleged violations of his civil rights.

---

**3.** According to regulations promulgated by the New York Department of Correctional Services,

[a] special housing unit (SHU), in maximum security facilities as well as in designated medium security facilities, shall consist of single-occupancy cells grouped so as to provide separation from the general population, and may be used to house inmates confined to such units pursuant to Part 301 of this Title as well as such other inmates as approved by the commissioner or his designee.

7 NYCRR § 300.2 (1991).

**4.** The document submitted as defendants' exhibit N states "[o]n behalf of the Commissioner and in response to your recent letter of appeal, please be advised that your Superintendent's Hearing of July 9, 1992 has been reviewed and AFFIRMED on September 3, 1992." The document is signed "Selsky, Director, Special Housing/Inmate Disciplinary Program".

**5.** An action under Article 78 of the New York's Civil Practice Law and Rules (McKinneys) challenges administrative determinations.

## THE STANDARD FOR SUMMARY JUDGMENT

■ Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986); *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir.1995). It is the moving party who bears the "initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Federal Deposit Ins. Corp. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)).

Once a moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e), Fed.R.Civ.P.; *accord, Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir.1994).

■ When deciding a motion for summary judgment, this Court must "view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its favor." *American Casualty Co. of Reading, PA v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir.1994). Where, as here, a party is proceeding pro se, this Court has an obligation to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994); *accord, Soto v. Walker*, 44 F.3d 169 (2d Cir.1995). However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment.

*Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991). To overcome a motion for summary judgment, the non-moving party must provide this Court with some basis to believe that his "version of relevant events is not fanciful." *Christian Dior–New York, Inc. v. Koret, Inc.*, 792 F.2d 34, 37–39 (2d Cir.1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts.") Thus, in determining whether to grant summary judgment, this Court must determine (i) whether a factual dispute exists based on evidence in the record, and (ii) whether, based on the substantive law at issue, the disputed fact(s) are material.

In submitting their respective motions, both plaintiff and defendants rely essentially upon the record of the administrative proceeding and appeal. In fact, outside of an attorney affidavit, defendants have submitted no affidavits based on personal knowledge. Hence, there are no material issues of fact in dispute and I render judgment on the application of the substantive law to the facts and documents in the record.

## DISCUSSION

In June of this year, the United States Supreme Court decided *Sandin v. Conner*, — U.S. —, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The *Sandin* Court reconfigured the analysis for determining whether a prisoner subjected to disciplinary confinement has a protected liberty interest entitling him or her to the procedural protections afforded under the Due Process Clause. In so doing, the Court rejected the analysis established by *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) and its progeny, returning to the due process principles established in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) and *Meachum v. Fano*, 427 U.S. 215, 216, 96 S.Ct. 2532, 2534, 49 L.Ed.2d 451, reh'g denied, 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1976).[6]

---

**6.** Prior to the Supreme Court's decision in *Sandin*, analysis of whether a liberty interest was protected would contain an examination of the text of prison guidelines or regulations to deter-

■ Insisting that protected liberty interests be of "real substance," the *Sandin* Court limited state-created liberties to "freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, —— U.S. at ——, 115 S.Ct. at 2300.

Because *Sandin* clearly applies to the instant case—which stands or falls on whether defendants infringed upon plaintiff's liberty interest protected by due process—the merits of plaintiff's claims must be evaluated.

## A. LIABILITY UNDER 42 U.S.C. § 1983

■ The purpose of 42 U.S.C. § 1983 is "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights, and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161, 112 S.Ct. 1827, 1830, 118 L.Ed.2d 504 (1992). Section 1983 provides a cause of action against any person who, acting under the color of state law, infringes on a person's rights secured by the Constitution or the laws of the United States. 42 U.S.C. § 1983. In this case, defendants act under color of state law in their positions as employees of the New York State Department of Correctional Services (NYSDOCS). The threshold question is whether defendants' actions deprived plaintiff of his "rights, privileges, or immunities" and if so, are defendants entitled to qualified immunity from plaintiff's suit. *Siegert v. Gilley*, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (prior to resolving the issue of whether a defendant has properly asserted a qualified immunity defense, a court must determine whether the plaintiff has asserted a violation of a constitutional right.)

Plaintiff alleges that defendants violated his rights in several ways. First, he alleges that his due process rights were violated by defendant Mahoney's denial of his right to an assistant to aid him in preparing for his hearing. Second, plaintiff maintains that he was denied his right to proceed before an impartial official. Finally, plaintiff claims that defendant Coughlin violated his rights by affirming the unconstitutional determination made by defendant Mahoney.

## B. WHETHER A LIBERTY INTEREST EXISTS IN PLAINTIFF'S CLAIMS

■ Liberty interests protected by the Due Process Clause may arise from either the Due Process Clause itself or from the laws of the states. *Sandin*, —— U.S. ——, ——, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995). Plaintiff cannot assert a liberty interest as established under the Due Process Clause itself because in a prison context, such interest will generally arise only where a prisoner is to be involuntarily transferred to confinement which is " 'qualitatively different' from the punishment characteristically suffered by a person convicted of a crime and results in 'stigmatizing consequences.' " *Id.* at ——, fn. 4, 115 S.Ct. at 2997, fn. 4 (*citing* to *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (involuntarily transfer to psychiatric hospital); *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (forced consumption of psychotropic medication against prisoner's will)). Thus, plaintiff's alleged liberty interest is protected by due process only to the extent that it arises under the laws of New York State and infringes upon his expected terms of confinement.

■ The evaluation of due process under state law requires a determination of whether (1) the state statutes or regulations at issue narrowly restrict the power of prison officials to impose the deprivation—giving the inmate the right to avoid it—and (2) the liberty in question is one of "real substance".

mine whether mandatory language that limited prison officials' discretion "created an enforceable expectation that the state would produce a particular outcome with respect to the prisoner's conditions of confinement." —— U.S. at ——, 115 S.Ct. at 2298. The *Sandin* majority rejected this test because "it creates disincentives for States to codify prison management procedures in the interest of uniform treatment" and because the approach "led to the involvement of the federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone." *Id.* at ——, 115 S.Ct. at 2299.

*Sandin,* —— U.S. at ——, 115 S.Ct. at 2298. Because it is undisputed that the state regulations at issue here narrowly restricted defendants' right to impose a disciplinary sentence on the plaintiff,[7] my inquiry must determine whether the liberty interest alleged to have been violated was one of "real substance," *e.g.* freedom from state action that will "inevitably affect the duration of [a] sentence," or restraint that imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." [8] *Id.* at ——, 115 S.Ct. at 2300.

The *Sandin* Court found that 30 days of disciplinary segregation was "within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life" in a maximum security prison. Thus, Mr. Sandin's disciplinary sentence was held not to be "atypical and significant" *Id.* at ——, 115 S.Ct. at 2301. Where an inmate served a substantial portion of a disciplinary sentence in SHU before a successful appeal, however, the Second Circuit has previously recognized that such sentences might constitute compensable deprivations of a liberty interest. *Walker v. Bates,* 23 F.3d 652, 658–59 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995). Walker had served 73 days of a 120 day sentence of confinement.

In the instant case, plaintiff served over one year of a two year sentence in SHU before his release. In relation to the ordinary incidents of prison life, I find that plaintiff Lee's confinement for 376 days in SHU imposed an atypical and significant hardship on plaintiff.[9] Thus, plaintiff has sufficiently alleged a liberty interest, even under the new light of *Sandin.*

7. Generally, when an inmate is confined to the SHU at a correctional facility for disciplinary reasons, he or she is deprived of a liberty interest protected by state law. *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984). *See also, Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

8. The *Sandin* majority articulated several factors which courts must evaluate in order to determine whether the disciplinary conditions are significant and atypical. These factors include (1) the likelihood of adverse disciplinary action resulting in loss of good-time credits; (2) the extent to which the conditions of disciplinary segregation differ from other routine prison conditions; and

## C. THE DUE PROCESS VIOLATION

■ Where a prisoner establishes a protected liberty interest of real substance, he is entitled to the procedural protections as set forth by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *Wolff* articulated the minimum procedures necessary to reach a "mutual accommodation between institutional needs and objectives and the provisions of the Constitution." *Id.; accord, Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). This guarantees a prisoner's right to be given twenty-four hours notice of the charges against him, a written statement of the evidence relied on by the fact-finder in the hearing, and the reasons for the disciplinary action taken by the hearing officer. *Wolff* 418 U.S. at 563–65, 94 S.Ct. at 2978–79.

■ In *Wolff,* the Supreme Court indicated that in certain circumstances, inmates subject to disciplinary charges have the right to assistance in preparing their defense. When an inmate is placed in restrictive confinement, the Second Circuit has held that the Fourteenth Amendment requires that the prison provide the inmate with assistance in obtaining evidence and interviewing witnesses. *Eng v. Coughlin,* 858 F.2d 889, 897–98 (2d Cir.1988).

### THE ASSISTANCE PRIOR TO THE HEARING

■ Defendants claim that Sergeant Kelly offered assistance to plaintiff on June 13, 1992, but that plaintiff refused to cooperate.

(3) the length of time that disciplinary segregation is imposed. *Id.* at ——, 115 S.Ct. at 2301–02.

9. *Sandin* was decided after the instant motions were filed. Neither party has asked to raise or brief the effect of *Sandin* on the facts presented here. I am hard pressed to believe that 376 days in SHU would not constitute an "atypical and significant hardship" as defined by *Sandin* and I assume that that is why defendants did not seek to supplement their papers. However, should the parties have additional arguments which bear on this issue, I invite a motion for reconsideration.

Sergeant Kelly wrote on the assistance sheet that "inmate Lee would prefer to see one of the assistants he chose" and that he "refused to sign" the assistance sheet. Defendants maintain that Sergeant Kelly was assigned so that they could hold plaintiff's hearing expeditiously in that the three assistants selected by plaintiff were not immediately available. *See* Defendant's Exhibit F ("Note—all three chosen don't work weekends—assistance was attempted on 6/12/92. Inmate Lee was on a visit 6/12—Fri—7 day limitation required other assistant be assigned—Hearing Officer J. Mahoney—Lee, R so advised on the tape. JM"). However, plaintiff's six (6) hearing days [10] were conducted over the course of 25 days and there is nothing in the record to suggest that all three of plaintiff's selected assistants were unavailable for the entire time. Plaintiff's Affidavit, ¶ 15; Hearing Transcript 7/8/92, Defendants' Exhibit G.

Surely, one of the assistants plaintiff requested could have been substituted for the assistant defendants selected for him, even crediting defendants' rationale for why Sergeant Kelly was assigned in the first instance. Alternatively, Sergeant Kelly could have been directed to return to plaintiff's cell to assist him after he requested assistance on the first hearing day.

■ Defendants argue that the sole interchange with Sergeant Kelly was the only assistance that plaintiff was entitled to. I do not agree. Defendants ask me to rule that plaintiff's expressed preference for an assistant he had designated constituted a waiver of his right to an assistant.[11] The record, however, does not support defendants' suggestion that plaintiff knowingly and voluntarily waived his right to an assistant. When Sergeant Kelly came to plaintiff's cell, plaintiff was unaware that the assistants he had selected were unavailable. Plaintiff did not know why Sergeant Kelly was assigned nor does the record demonstrate that Sergeant Kelly told him why.[12] Plaintiff was not told that the people he had selected as his assistants were unavailable until Mahoney told him at his first hearing to which plaintiff responded "I didn't know that."[13] That plaintiff told Sergeant Kelly that he would prefer one of the assistants he had chosen was not a waiver of plaintiff's right to an assistant, particularly where plaintiff repeatedly requested at the hearing that he be given an assistant.[14]

10. Plaintiff's disciplinary hearing was conducted as follows:

| | |
|---|---|
| 6/15/92 | 10:10–10:18 |
| 6/18/92 | 8:40–8:49 |
| 6/22/92 | 2:29–2:45 |
| 6/24/92 | 12:36–12:44 and 3:21–3:41 |
| 7/8/92 | 3:17–3:30 |
| 7/9/92 | 3:11–3:27 and 3:57 (disposition read into record) |

11. Defendants argue that because all three people plaintiff had designated as his assistants were civilians, they were initially unavailable because civilians do not work weekends and plaintiff's hearing commenced on a Monday morning. Plaintiff explained on the day before his last hearing date that he had designated a civilian assistant because a key element in establishing his case would involve discrediting the report of the incident made by Sergeant Millen and he doubted whether one Sergeant would challenge the version of events related by another Sergeant. Plaintiff's Affidavit ¶¶ 16–18; Hearing Transcript from 7/8/92, Defendants' Exhibit G. I am not being asked to address what a prisoner's right might be to designate a particular assistant. Plaintiff was not asking for a particular individual but for a type of individual, i.e. a civilian. Moreover, there is nothing in the record proffered by defendants to suggest that plaintiff's request was either burdensome or a subter-

fuge to delay the hearing. Instead, the delays occasioned in the hearing occurred precisely because plaintiff at each hearing had to ask for particular witnesses and documents instead of having an assistant do the work for him.

12. Plaintiff's 3(g) statement alleges

8. On the morning of June 13, 1992 a Sergeant Kelly came to Plaintiff's cell, and asked did you request assistance. Plaintiff told Sgt. Kelly that he did request assistance, but made it a point not to select a sergeant.

9. Sergeant Kelly then looked over the assistant sheet, acknowledged that her name was not checked off, Sergeant Kelly then said, "I wonder why they gave this to me" and she wrote on the assistance sheet, "inmate Lee would prefer to see one of the assistants he chose" and she left.

13. Defendants maintain that on June 12, 1992, one of the assistants plaintiff had selected had gone to his cell, but that plaintiff was on a visit. Defendants control plaintiff's custody. Defendants cannot argue that plaintiff intentionally made himself unavailable or by this act waived his request for an assistant.

14. *See* the excerpts from plaintiff's disciplinary hearing transcripts attached hereto. The entire

Plaintiff specifically requested an assistant from defendant Mahoney at three of the hearing days and he tried to raise the issue at the other hearings as well. The hearing transcript clearly demonstrates that Mahoney was not responsive to plaintiff's requests for an assistant; Mahoney repeatedly changed the subject. Plaintiff was never offered an assistant after Sergeant Kelly's visit. He was never even offered the aid of Sergeant Kelly again. Defendant Mahoney adjourned plaintiff's hearing five times over the course of 25 days. There was amply opportunity for him to check the availability of the designated assistants and he never did. Defendant had ample notice and opportunity to provide plaintiff with an assistant; Mahoney failed to do so and has failed to offer a valid reason for his refusal to provide an assistant after plaintiff again asked for one at the first hearing day. Mahoney continued to deny plaintiff an assistant despite the clear requirements of *Wolff* and caselaw in this Circuit that prisoners must be provided with such assistance.

## *THE ASSISTANCE AT THE HEARING*

■ As to Defendants' position that Mahoney "fulfilled the function of an employee assistant for plaintiff" after the hearing commenced [15], I cannot accept an argument that Mahoney's substitution of himself, the designated hearing officer, as an inmate's assistant fulfills due process concerns. Under New York regulations, plaintiff is entitled to both an impartial hearing officer and an assistant. It is disingenuous for defendants to argue in retrospect that Mahoney satisfied both roles.

■ The requirement of impartiality as a hearing officer in the prison context is inconsistent with any allegation that Mahoney acted as plaintiff's assistant. In any event, Mahoney's assertion that he functioned as plaintiff's assistant is not supported by the record. Plaintiff is entitled to assistance to prepare a defense, not just to "fulfill the function … after the hearing commence[s]." Defendants' Reply Memorandum, p. 5. Were I to adopt defendants' position that a hearing officer and an inmate assistant could be the same person, the confined inmate's right to an assistant and an impartial hearing officer would be rendered meaningless.

■ Defendants maintain that the determination of the state court should not be binding in this proceeding. I need not reach this issue. Whether or not the state court's decision is binding, it is surely persuasive evidence of defendants' failure to provide plaintiff with meaningful assistance to prepare his defense to the charges against him. As did the state court, I find that there were many issues raised by the reports relating to the underlying assault charges against plaintiff which an assistant could have aided plaintiff in investigating. Mahoney denied plaintiff an assistant to prepare his defense and Mahoney failed to address many of the questions.[16]

In *Fox v. Coughlin*, the Second Circuit stated "we write to emphasize that a failure to provide an inmate assistance in preparing a defense or interview an inmate's requested witnesses without assigning a valid reason may in the future provide a sufficient basis

---

transcript is annexed to Defendants' moving papers as Defendants' Exhibit G.

**15.** Defendants argue that "[i]n other words, after the hearing commenced, Mahoney fulfilled the function of an employee assistant for plaintiff so that plaintiff was not prejudiced by not being assigned the employee assistant of his choice. Moreover, plaintiff fails to allege or show that the employee assistant of choice would or could have provided any further assistance than Mahoney; alternatively stated, plaintiff fails to show that Mahoney's actions were sufficiently deficient to rise to the level of a constitutional violation which was avoidable if plaintiff had received his chosen employee assistant." Defendants Reply Memorandum, p. 5.

**16.** For example, a significant and unanswered question in the record was whether there was a confidential informant or the victim was the confidential informant. *See* Defendants' Memo of Law, p. 19, fn. 2. Further, Sergeant Millen's testimony on July 9, 1992, raised for the first time that the victim had been involved in another incident earlier on the day of the assault and that one of the reports underlying the charges against plaintiff must have "mixed up" the incidents. See Hearing Transcript of 7/9/92, Defendants' Exhibit G. Mahoney not addressed these questions.

for a viable § 1983 action". *Fox*, 893 F.2d 475, 478 (2d Cir.1990). Here, Mahoney offers no reason for his failure to assign an assistant after the first hearing when plaintiff specifically asked for one and explained the steps he wanted an assistant to take.

In plaintiff's original pleading he stated "I was denied meaningful and effective assistant because I didn't get no assistant at all". Complaint p. 4. I agree. Thus, defendant Mahoney can be liable for denying plaintiff his right to an assistant to aid him in preparing for his hearing. *See Soto v. Walker*, 44 F.3d 169 (2d Cir.1995) (once plaintiff demonstrates that his due process rights were violated, he may be compensated for the time he spent awaiting his appeal); *Walker v. Bates*, 23 F.3d 652, 685–59 (2d Cir.1994) ("The rule is that once prison officials deprive an inmate of his constitutional procedural rights at a disciplinary hearing and the prisoner commences to serve the sentence imposed at the conclusion of the hearing, the prison official responsible for the due process deprivation must respond in damages, absent the successful imposition of a qualified immunity defense.")

## D. QUALIFIED IMMUNITY

■ Defendants do assert qualified immunity as an affirmative defense to plaintiff's due process claim and request for damages. A defendant may establish a right to qualified immunity by showing that:

it was not clear at the time of the official acts that the interest asserted by the plaintiff was protected by a federal statute or the Constitution; [or that] it was not clear at the time of the acts at issue that an exception did not permit those acts; [or that] it was objectively reasonable for [the officer] to believe that his acts did not violate [plaintiff's] rights.

*Krause v. Bennett*, 887 F.2d 362, 368 (2d Cir.1989) (quoting *Robinson v. Via*, 821 F.2d 913, 920–921 (2d Cir.1987); *accord Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir.1994).

■ Qualified immunity acts to shield government officials from liability under Section 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Plaintiff alleges that defendant Mahoney violated his due process rights by denying his right to an assistant to aid him in preparing for his hearing. I find that by June of 1992, there was a clearly established right to an inmate assistant in this Circuit and that the contours of the right to an assistant to aid an inmate confined in SHU to prepare for a disciplinary hearing were sufficiently clear in 1992. *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir.1993) (per curiam); *Fox v. Coughlin*, 893 F.2d 475, 478 (2d Cir.1990) (per curiam); *Eng v. Coughlin*, 858 F.2d 889 (2d Cir.1988).

Defendants do not dispute that a confined inmate's right to an assistant was clearly established and its contours known in 1992. Rather, defendants attempt to proffer a valid reason for their failure to assign an assistant to plaintiff, *Fox*, 893 F.2d at 478, and therefore, that they did not understand that what they were doing violated plaintiff's rights. I find, however, that a reasonable official would have understood that what he or she was doing violated that right. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

Defendant Mahoney's statements during the hearing on July 8, 1992 attest to his understanding that what he was doing violated plaintiff's right to an assistant. When plaintiff repeated yet again at this hearing that he had never seen any assistant, and explained why he had requested a civilian assistant, Mahoney stated "[a]nd for the record, this is the first Mr. Lee is advising the hearing officer of this problem." This was patently untrue because plaintiff had told Mahoney of his desire for an assistant on two prior occasions. *See* Hearing Transcript of 6/15/92 and 6/18/92, Defendants Exhibit G. That Mahoney understood his obligation to provide an assistant is clear from the record of 7/8/92 itself:

[Plaintiff asked] "so now, can I, in the meantime, while I'm waiting, like tomorrow, can I have, like see an assistant, because I want assistance to do something for me", Mahoney responds "Such as?"

Plaintiff states "I want to keep that between me and my assistant." Mahoney states "Well if you had been getting assistance now, at this point the hearing officer would have to direct the assistant, if there was a need for one."

Mahoney has proffered no reason why he could not get a civilian assistant that day. Mahoney had adjourned the hearing several times for other reasons, yet at this next to last hearing date when Mahoney was advised yet again that plaintiff had not had an assistant and still wanted one and why, he made no attempt to correct "this problem" which he recognized to be a problem. I find that no reasonable officer in 1992 could believe that the act of denying plaintiff an assistant did not violate plaintiff's rights, particularly when plaintiff repeatedly and explicitly requested an assistant on at least three hearing dates.

I note that plaintiff was not asking for an assistant of his choice by designating his preference for a type of employee who was on the assistance sheet given to him. No reasonable officer in 1992 could believe that under the circumstances presented plaintiff had waived his right to an assistant because of plaintiff's reactions to Sergeant Kelly on the initial and only visit. Defendant Mahoney is therefore not entitled to qualified immunity and defendants' motion for summary judgment on behalf of Mahoney is denied and plaintiff's motion for summary judgment is granted.

### E. COUGHLIN'S INVOLVEMENT

■ Plaintiff, however, has not alleged sufficient facts regarding defendant Coughlin to hold him liable in this action. That plaintiff appealed the hearing officer's decision to the Commissioner does not establish Coughlin's personal involvement. Plaintiff's limited communication with the Office of the Commissioner, without more, does not establish a constitutional violation. *See Candelaria v. Coughlin,* 787 F.Supp. 368, 373 (S.D.N.Y. 1992).

■ "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prereq-

uisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)); *Al–Jundi v. Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989) (in order to make out a Section 1983 case, plaintiff must establish each defendant's personal involvement in the acts complained of); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986). Therefore, defendants' motion for summary judgment is properly entered as to defendant Coughlin.

### CONCLUSION

Defendants' motion for summary judgment is granted dismissing plaintiff's claims against defendant Coughlin. I deny defendant Mahoney's motion asserting a qualified immunity defense and grant plaintiff's motion for summary judgment against defendant Mahoney. In light of my denial of defendant Mahoney's qualified immunity defense and in order to conserve judicial resources, I hereby certify the entry of a partial judgment as to defendant Coughlin dismissing the complaint against him and partial summary judgment against defendant Mahoney on the issue of liability under Fed. R.Civ.P. 54(b). There is no just cause for delay. Judgment on damages against defendant Mahoney to enter after inquest on damages by a designated Magistrate Judge.

**SO ORDERED.**

### APPENDIX

### *EXCERPTS FROM DISCIPLINARY HEARING TRANSCRIPTS*

**Excerpt 6/15/92 Hearing:**

Mahoney: Assistance was provided by Sgt. Kelly on 6/13/92. You refused to sign. The statement says, you were ____, [sic] you wanted the assistant that you chose. Okay. Okay, they tried to assist you on 6/12, there is a notation here, had to be reassigned because you were on a visit. Were you on a visit last Friday?

Lee: Friday? Yes.

Mahoney: Okay. You were assisted on ____, [sic] on the twelfth. The bottom line is, if we can't give you the assistance of the

particular person you selected, for whatever reason, then we have to go to somebody else. You requested two witnesses. 327 and 250. Was there anything besides those two witnesses that you wanted your assistance to do?

Lee: I wanted my assistance to interview, to interview the guy that I'm being charged with assaulting and I wanted the assistance to give me like, the unusual incident report and any statements or whatever it was that was make against me.

Mahoney: So why didn't you ask Sgt. Kelly for that? What was the problem?

Lee: But I'm saying, Sgt. Kelly wasn't the, uhm

Mahoney: Alright. That wasn't the person you selected, but they tried to work with the person you selected as well

Lee: I didn't know that.

Mahoney: They couldn't get them into the schedule because of whatever reason.

Lee: I didn't know that.

Mahoney: Okay. So you want the U.I. what else was there? You wanted a statement from the victim.

Lee: Any statement that was made against me, you know, on the night of the incident. I want to get all that, and I want to get my assistance, _____, [sic] or who I was supposed to have got.

Mahoney: Let's see, the victim was, _____ [sic] I have that, I've had victim's requested as far as testifying, which of course most times they don't _____ [sic]. What I'm trying to say is, to have the assistant go to see the victim, I don't see any rulings on that, one way or the other,—[sic]. But we'll see if the victim wishes to testify. Meanwhile we'll proceed with this hearing. Your two witnesses were brought down with you. Is that correct?

Lee: No they wasn't.

Mahoney: 327 and 250 were not brought down?

Lee: No.

Mahoney: Alright. I guess we'll have to adjourn anyway ... The date is 6/15/92. The time is 10:17 a.m. You want to sign there? You're pleading not guilty. Okay, what would you like to say?

Lee: Well first, like I said, you know, I wanted uhm, get myself another one of these assistants first, before I, you know, _____ [sic] my defense. That's why I wanted to see my assistance first. Okay.

Mahoney: Okay. We'll adjourn the hearing. The assistant will not be going to your cell, but if there is a U.I. report, it will be delivered to you. Meanwhile we have to adjourn since your witnesses aren't down here anyway. I will see if the victim, Pinkney, wishes to testify on tape. If he does, you will hear his testimony. Okay? The time is 10:18 a.m. This hearing is adjourned.

**Excerpt from 6/18/92 Hearing:**

Lee: You see that's the reason that I had uhm, asked for an assistance, because I felt that maybe the assistant would be able to uhm, give me whatever information they got or whatever. The investigation that was done, that

Mahoney: Mr. Lee, everything we've got is in that U.I. report. If it's not there, it's not here. Neither of us can use it, okay. It doesn't exist as far as this hearing is concerned.

Lee: Oh, okay.

Mahoney: And for the record, let me refresh my memory and Mr. Lee's memory, in regard to the assistance. Assistance was offered, was scheduled for June 12th, which was a friday. The three people he picked were all civilians. He—[sic], which was checked out at twelve. They usually don't enter three, I don't know what time your visit ended, but these people cannot stand around all day waiting for you to

Lee: The visit ended at 1:30.

Mahoney: Okay. Unfortunately that are not able to check that. They have other assignments, Okay. Mr. _____ [sic] I know works in the education department. Mr. Davis is a counselor, and these individuals leave at 3:00, 3:30. Therefore the next day we have available assistance, we are talking saturday and sunday, and civilians don't work. Your assistance had to be offered at that time because the date of

this report is 6/9. Add six days to that, it's 6/15, which is monday, okay. Sgt. Kelly was in effect drafted to provide you with assistance, okay. Now what I'm going to do is adjourn the hearing. I'm going to have to have Sgt. Millen testify. I will check to see if he's working this afternoon. I'm also going to check with Mr. Pinkney, the alleged victim, to see if he wishes to make a statement what so ever. Anything else you want to say before we adjourn?

Lee: Uhm, it was requested that I had wrote down that I wanted to give to the assistance, if I was able to see one, so they could interview this guy and ask him certain questions for me.

**Excerpt from 7/8/92 Hearing:**

Lee: Yeah, but I want to ask you did you interview three assistants you chose, to find out why nobody never came to assist me.

Mahoney: I already advised you of that on tape. The three assistants you chose, they tried, one of them, whoever it was, I don't recall, I don't have the case in front of me, attempted to assist you on Friday, I believe that was the, was it June 12th? Whatever the date was, you had a visit that day.

Lee: Right.

Mahoney: Okay. They were not able to get back to you at any other time of day, you said you ended your visit at 1:00. _____. [sic] They tried to assist you, you had a visit that day. That was on a friday. Saturday and Sunday those people don't work. Because of the seven day limitation, we had to get you an assistant so we could start the hearing on by Monday.

Lee: Well I started the hearing on the sixth day.

Mahoney: And what day was that?

Lee: I started the hearing on June 15th.

Mahoney: That was a Monday.

Lee: Right.

Mahoney: But in the event you give that assistant some witnesses to check out, et cetera, et cetera, which can run longer than a day, I can start the hearing but your assistance would not have been completed.

Lee: But the assistance would have been, if I had seen the assistance like on that Monday, and I would have had enough time the next day, twenty-four hours.

Mahoney: If the assistance was finished. suppose you had the assistant, who ever the assistant was on Monday, check with three witnesses and check with the three witnesses and get back to you, suppose for whatever reason they didn't get to the three witnesses, then I can't start the hearing.

Lee: Right.

Mahoney: Or—[sic] where we have to the seventh day to start the hearing, but the assistance should be completed by 24 hours before, on the sixth day.

Lee: But I thought, it was in uhm, chapter five, they said that the hearing is not supposed to start at all until I uhm, see my assistance, if I requested assistance. The hearing is not supposed to start until I see my assistant first.

Mahoney: That's correct.

Lee: I've never seen no assistant. I've been waiting, while we've been on this extension for two weeks, I've been waiting for assistance to come see me, I haven't seen nobody.

Mahoney: You didn't see anybody?

Lee: I haven't seen nobody.

Mahoney: You didn't see the one you wanted, but you saw somebody.

Lee: I seen Sgt. Kelly, she came to interview me like maybe the day after the, the assistant came to my cell when I was on a visit and uhm, I told Sgt. Kelly she wasn't one of the people that I picked, and she didn't even attempt to, you know, try to assist me, she looked at the sheet and she seen that she wasn't one of the names that I picked and she just, you know, said that inmate—[sic] to receive one of the assistants that I chose. My reason for not wanting to pick Sgt. Kelly is because a sergeant wrote my misbehavior report, I figured having a sergeant as being my assistant would be a conflict of interest,

438

that's why I wanted a civilian to be my assistant. That's why I went up, when the officer brought the assistance form to me, I asked him to show me assistants you know, that are civilians.

Mahoney: Well that wasn't noted on the assistance form, that you wanted only civilians because a sergeant had wrote your misbehavior report.

Lee: But I'm saying.

Mahoney: And for the record, this is the first Mr. Lee is advising the hearing officer of this problem. Please proceed.

Lee: What about the uhm, the uhm, the names that I checked, would show that I picked three civilians.

Mahoney: I know you checked three civilians.

Lee: Right.

Mahoney: It's what I already stated to you over two weeks ago.

Lee: Right.

Mahoney: The reason you didn't have any civilian assistant, is they do not work on weekends.

Lee: So you're saying that this is the first time that I brought what to your attention?

Mahoney: The fact that you didn't want a sergeant giving you assistance, because a sergeant had written the misbehavior report.

Lee: Right.

Mahoney: It was a conflict of schedules. We have a schedule to get your hearing started within seven days, in order to comply with that directive, assistance had to be provided on saturday and sunday, as you were not available to the civilian you requested on friday.

Lee: I also, I have uhm, a case in my cell that says that uhm, whenever anyone requests assist, I mean an extension, that when the extension runs out, that they can't get another extension.

Mahoney: Well I don't know anything about ____ [sic] case, but it's going to Albany right now because, as you know, Sgt. Millen works the three o'clock shift.

Lee: Right.

Mahoney: So I had no way of knowing he's not going to show up until I have the three o'clock line up tell me so. He did report via Lt. Enceneat for his paycheck, but being that he's on vacation, he's not coming, he stopped at the facility, he was not in work clothes. He is scheduled and will be in tomorrow at three o'clock. If he is not here tomorrow at three o'clock, I am going to proceed without him. Fair enough?

Lee: So now, can I, in the meantime, while I'm waiting, like tomorrow, can I have, like see an assistant, because I want assistance to do something for me.

Mahoney: Such as?

Lee: I want to keep that between me and my assistant.

Mahoney: Well if you had been getting assistance now, at this point the hearing officer would have to direct the assistant, if there was a need for one.